## THE PEOPLE v. CARPENTER.

The power to lay out the town of Detroit, given the governor and judges of the territory of Michigan, by the act of Congress of April 26, 1806, entitled "An act to provide for the adjustment of titles to land in the town of Detroit, and territory of Michigan, and for other purposes," was fully executed by the governor and judges on 27th April, 1807.

A flight of stairs, fifteen feet high and three feet eight inches wide, within the limits of Woodward Avenue, in the city of Detroit, leading from the ground to the second story of a building standing on the line of the street adjacent to the stairs, is an obstruction of the street not authorized by the acts of the governor and judges of the territory of Michigan, of the 18th May, 1807, and 7th November, 1815, nor by the ordinances of 1836 and 1842, of the common council of the city.

Every obstruction in a street or highway is not a nuisance.

Whether an obstruction in a street or highway, is or is not a nuisance, is a question of fact to be found by a jury, and not a question of law.

Neither the governor and judges of the territory of Michigan, nor the common council of the city of Detroit, had, or have, any power or authority to grant the exclusive use of any of the streets or alleys of the city to individuals.

CASE reserved from the District Court of Wayne county.

At the September term of the district court, in 1845, the following indictment was found against Carpenter for obstructing Woodward Avenue in the city of Detroit:

"*Wayne county, ss:*—The grand jurors of the people of the state of Michigan, inquiring in and for the body of the county of Wayne aforesaid, upon their oaths present, that on the first day of January, in the year one thousand eight hundred and twenty-three, was, and from thence hitherto there hath been, and still is, a certain common and public highway, commonly called Woodward Avenue, leading from a certain place in the city of Detroit, in the county of Wayne aforesaid, commonly called the Grand Circus, to a stream of water in the city of Detroit aforesaid, commonly called the Detroit river, for all the citizens and inhabitants of the state of Michigan aforesaid to go, return, pass and repass, ride and labor, on foot and on horseback, and with their

horses, coaches, carts and carriages, in and along the same, at their free will and pleasure, without any obstruction, hindrance or impediments.

And the jurors aforesaid, upon their oaths aforesaid, do further present, that William N. Carpenter, late of the county aforesaid, afterwards, to wit: on the first day of January, one thousand eight hundred and forty-four, with force and arms, at Detroit in the county of Wayne aforesaid, and within the jurisdiction of this court, in and upon the aforesaid common and public highway, unlawfully and injuriously made, placed, built and erected, and caused to be made, placed, built and erected, divers steps made of stone, iron and other materials, of great height and width, to wit, the height of fifteen feet, and the width of four feet, and also a certain erection composed of stone, iron and other materials, of the same height and width aforesaid, and by the same steps and erection encroached upon, stopped up and obstructed a certain part of the aforesaid common and public highway, for a large space thereof, to wit, for the space of four feet in length and four feet in width; and the same part of the common and public highway aforesaid so encroached upon, stopped up and obstructed, he, the said William N. Carpenter, upon and from the said first day of January aforesaid, until the day of the taking of this inquisition, with force and arms at Detroit aforesaid, and within the jurisdiction of this court, unlawfully and unjustly hath continued and still doth continue, whereby the citizens and inhabitants of the state of Michigan, during all the time last aforesaid, could not, nor can they now, go, return, pass and repass, through, over and along the aforesaid common and public highway, on foot and on horseback, and with their horses, coaches, carts and carriages, as they were used and accustomed to do, and ought to have done and to do; but during all the time aforesaid have been and are greatly obstructed and hindered in the use and enjoyment of the said common and public highway, to the great damage and nuisance of all the citizens and inhabitants of the state aforesaid, against the form of the statute in such case made and provided, and against the peace and dignity of the people of the state of Michigan."

To the indictment the defendant plead not guilty, and on the trial the jury returned the following special verdict: That, pursuant to the act of congress passed the twenty first of April, eighteen hundred and six, the governor and judges adopted a plan and laid out the city of De-

troit, on the thirteenth and twenty seventh days of April, eighteen hundred and seven, including the road or avenue in such city known as Woodward Avenue, being one hundred and twenty feet in width, and extending from the Detroit river to the Grand Circus in said city; and from that time to the present the road or avenue so laid out has been used and travelled as a highway: that William N. Carpenter did erect and since has continued, as charged in the indictment, on the side-walk, within the limits of said Woodward avenue, a flight or pair of steps composed of stone and iron, fifteen feet in height and three feet eight inches in width, adjacent to and opposite a lot owned by said Carpenter, with a brick pavement under and around them, and that said steps adjoin the building erected on said lot, owned by defendant: that in the year eighteen hundred and six, James Abbott erected a house on said street; that also one Curry erected a house on the corner of said Woodward and Jefferson avenues, on the westerly side of said Woodward avenue; that one Godfrey erected a house on the opposite side of said Woodward avenue, in eighteen hundred and six; that one Smith erected a house on said Woodward avenue; also one Scott erected a house adjacent to said Smith, in rear of said Curry's house, in same year; all of said houses except the last were built on the line of said avenue: that in front of said Smith's house was a platform extending the whole front of the house and projecting in the street some eight or twelve feet; (some years afterwards said platform was changed into a gallery with a roof): that in front of Godfrey's house there was built a portico, with a roof extending into the street six or eight feet, and in height twelve or eighteen feet: that there was a fence in front of the Scott house, projecting some feet into the street: that Abbott placed before his house, in eighteen hundred and sixteen, a similar fence, extending ten feet into the street. No other houses were built until after the city was laid out as aforesaid, but that similar and other erections were subsequently made in other parts of the city, as the taste of the owners suggested, extending into the street: that said steps mentioned in said indictment are adjacent to the lot where the said house of said Curry was built: that on that part of Woodward avenue there were two or three steps in that street, ascending to the ground floor of Curry's house or store: that as early as the period when said houses and projections were built, the lines or boundaries of said Woodward ave-

nue were well understood, and were the same as those which now are the lines or boundaries of said avenue: that the said houses were intended to be built on said lines or boundaries, except said Scott's: that said porticoes, platforms and projections should be in the street. They find, also, that various ordinances have been from time to time passed by the authorities of the city of Detroit relative to sidewalks and projections, and spaces in the streets of said city: all of which shall be deemed to be and taken as a part of this special verdict. If upon these facts, under the laws of the state and the said ordinances of the city of Detroit, the court shall be of the opinion that the said steps are a nuisance, then the jury find the said defendant guilty, otherwise not guilty.

The prosecuting attorney moved for judgment on the special verdict, which motion was reserved by the district court for the opinion of this court.

*Joy*, for The People.

*Barstow and Lockwood*, for defendant.

*By the court,* WHIPPLE, Ch. J.    By the act of congress of April 21, 1806, entitled " An act to provide for the adjustment of titles to land in the town of Detroit and territory of Michigan, and for other purposes," the governor and judges of the territory of Michigan, or any three of them, were authorized to lay out a town, including the whole of the old town of Detroit, &c.

The first question which naturally presents itself, is, whether the authority thus conferred was ever executed ?  To determine this question, we must necessarily refer to the acts of the governor and judges; and it is fortunate that the records of those acts have been preserved through a period of more than forty years, and bear on their face the stamp of verity.

Let us now trace, by these authentic records, the various acts of those high public functionaries, in execution of the trust committed to them by the act of 21st April, 1806.

On the first page of the record of their proceedings, is to be found the act of congress; then follows the proceedings of the board at their first meeting on the 6th September, 1806.  At this meeting, a committee,

consisting of Judge Woodward, was appointed, "to take into consideration the subject matter of the said act."   On the 8th September, Judge Woodward made a report, when the following among other resolutions were adopted:

1. "*Resolved*, That it is expedient immediately to lay out and survey a town, under the said act of Congress, and to adjust the titles and claims to lands and lots therein."

2. "*Resolved*, That the basis of the said town be an equilateral triangle, having each side of the length of 4,000 feet, and having every angle bisected by a perpendicular line upon the opposite side; such parts being excepted as, from the approximation to the river, or other unavoidable circumstances, may require partial deviations"

On the 5th November, 1806, resolutions were adopted by which a general system was provided for numbering the different sections of the city of Detroit, and also for numbering the lots in each section.   On the 14th of November, the resolution respecting the numbering of the sections, was rescinded.   On the 13th April, 1807, the surveyor having presented to the board a plan of sections 7 and 8, the board, on motion of Judge Woodward, resolved, "that the said plan of section 7 be confirmed, and the same be a public record, and that it remain with the secretary of the governor and judges, and that no person be suffered to make any alteration without their order to that effect."   On the same day, it was ordered, "that the surveyor make a plan of the section numbered three, to be a record; and that a committee be appointed to superintend the said plan."   On the 14th April, it was ordered, "that the surveyor be directed to prepare a plan of the sections numbered one, four, two, six, three, nine and ten, under the direction of the committee, to be kept as a record when approved."   On the 16th April, it was resolved, "that the plan of section numbered seven, adopted on the 13th April, be signed by the governor and the judges, or some one or more of them in identification, and be attested by the secretary of this board."   On the 27th April, it was resolved, "that the plan of the sections numbered 1, 2, 3, 4, 6 and 8, be confirmed and be a record, and that they be signed by the president of the board, and be attested by the secretary in identification; and that no alteration be suffered therein without an order of the governor and judges to that effect."   On the 22d May, a committee was appointed to bring in a bill concerning the naming of streets.

An examination of the original plans of sections 1, 2, 3, 4, 6, 7 and 8, shows that they were authenticated in the manner prescribed by the resolutions of the 13th and 27th April. On the 18th May, 1807, the governor and judges passed an act entitled " An additional act concerning the town of Detroit." This act provides, among other things, that in the avenues of the town a space of ten feet shall be allowed contiguous to the front lines of lots on each side, for the purposes of erecting porches in front of houses, doors of cellars, for an area to allow lights in apartments below the level of the ground, for a grass plat or shrubbery, and for other purposes of utility or ornament, as the proprietor or lessee of the proprietor may direct.

In November, 1815, the governor and judges passed another act, limiting the erections, authorized by the act of May, 1807, to fifty inches in height. In the revised ordinances of 1836 of the city of Detroit, a space in front of the established line of all streets is allowed for projections: provided, the space shall either be enclosed or paved with flat or round stone or brick; and that upon streets 120 feet wide, such space shall be allowed to extend seven feet from the established line, &c. The revised ordinances of 1842, after establishing the width of side walks within the limits of the city, provide, that " on streets of the width of 120 feet and upwards, any projection shall not extend more than seven feet."

I have thus briefly noticed the several acts of the governor and judges, as well in relation to the execution of the power vested in them by the act of 1806, as those which relate to the spaces allowed the owners of lots contiguous to the front lines. A correct knowledge of these last acts becomes necessary, in consequence of the conflicting views taken by counsel of their effect and bearing on the important questions raised in the case, and upon which the judgment of this court is to be pronounced. For the sake of convenience, I have also referred to such ordinances of the common council as authorize the use of such spaces.

It was contended by the counsel in behalf of the people, that the powers of the governor and judges, in relation to the plan of the city, were exhausted on the 27th April, 1807. On the other hand, it is contended that those powers continued until the 18th May, 1807; and that the act passed on that day was in fact the dedicatory act. It may be admitted that, until the town of Detroit was actually laid out by the

governor and judges, any of their previous acts, in the prosecution of that duty, might be the subject of revision and alteration. For instance, the basis of the town of Detroit was laid down by a resolution adopted as early as the 8th Sept. 1806. If, in the progress of their labors, it had been discovered by the board that such a basis was either impracticable or inconvenient, it would have been competent for them to modify it, before the final act of dedication. It appears that on the 13th April, 1807, section 7 received the final action of the board, so far, at least, as to determine its form and extent, and the streets, areas and lots within it. The other sections appear to have been confirmed on the 27th day of the same month. Do the transactions of the board on those days furnish evidence from which it may be inferred that the trust had been fully executed? In the first place, it appears, from an inspection of the plans of the various sections, that they were laid out according to the basis prescribed as early as September, 1806. Secondly, they exhibit on their face streets, alleys, open spaces or areas, and are subdivided into lots of convenient size: they also indicate the means for determining the sides of the sections, the width of the streets and alleys, and their courses; the dimensions of the open spaces or areas: the lots also are numbered, according to the plan prescribed by the resolution of 5th November, 1806. Nothing further was necessary to render the various sections complete; so that, when transferred and arranged on paper, according to the basis previously adopted, the plan of a town, perfect in itself, would be exhibited. No explanation, extrinsic the plan, would be necessary to show the purposes for which the different spaces were intended. For example, the two exterior lines on each side of the sections, indicate with sufficient certainty that broad avenues were intended ; the open areas in the centre indicate with like certainty for what they were intended. Viewing these facts in connection with the other acts of the board, as they appear in the records, and the conclusion seems irresistible, that the town was laid out on the 27th April, 1807. What more solemn form could the board have adopted, to make known their intentions, than the resolution adopted by them on that day? The sections, as reported by the surveyor, were *" confirmed ;"* they were ordered to be made matter of *" record,"* and to be *" signed by the president of the board and attested by the secretary in identification."* On that day, they were signed by the president and

attested by the secretary. What words more expressive or significant could have been used to convey the idea, that the board considered that the trust committed to their hands had been executed? What more solemn form of dedication could have been devised? The plan of the town was the offspring of the comprehensive but somewhat erratic mind of the presiding judge of the supreme court: that he was proud of that offspring is well known; and the same anxious care which he manifested in its formation, seems to have exhibited itself in the means adopted to preserve it from the hand of innovation in its maturity. It is true, that the streets do not appear to have been designated by name: this, however, was not necessary. That certain spaces were intended for streets, is obvious from inspection.

I am unable to appreciate the force of the reasoning by which the act of May, 1807, is to be considered as the act of dedication. Its chief object seems to have been, to allow certain spaces contiguous to the front line of lots for purposes of utility or ornament; to define the width of side walks; to provide means by which the health and beauty of the town might be promoted, and to designate the purposes to which the internal space of ground in the middle of each section was to be devoted. It does not purport to be the act of the governor and judges in their special character of commissioners charged with the execution of a particular duty; on the contrary, it assumes all the *forms* of a law, and clearly indicates that it was passed by them in thier *legislative* capacity. The title, the enacting clause, the signatures of the governor and judges, the attestation of the secretary, all combine to show that it was an act of legislation: that they were executing the powers which appertained to them as a legislative body, and not those of commissioners. To attribute to that act the character assigned to it by counsel, would be to argue on the part of the governor and judges a degree of ignorance in respect to their functions, utterly inadmissable.

Beside, the body of the act contains matter which would seem to be conclusive of the question. The first section provides, " that in the avenues of the *town* or *city* of Detroit, there shall be a space of ten feet contiguous to the front line of *lots*, for the purpose of erecting porches, &c. The second section allows ten feet, contiguous to the ten mentioned in the first section, for a walk for the accommodation of persons passing on foot, &c. The third section provides, at a distance of twenty

feet from the line of the lots, on each side of the avenues, running N. 30 deg. E., N. 60 deg. E., N. 30 deg. W., and N. 60 deg. W., shade trees should be planted, &c. The fourth section directs the mode of planting trees on streets having a north and south, and east and west direction. The fifth section provides, that in streets of the width of sixty feet, seven feet shall be allowed for porches, &c. By section six, the squares or other spaces of ground where six avenues intersect, and those spaces where twelve avenues intersect, were to be planted with trees, &c. Section seven declares the purposes for which the internal spaces of ground, in the middle of each section, were reserved. The eighth section, in order to secure regularity and beauty in carrying into execution the act, imposes upon the surveyor a duty.

This analysis of the act shows, very conclusively, that its provisions were made and intended for a town actually laid out, and not one in embryo. It refers to lots, to streets of a particular width, to avenues having a certain course, to squares where six avenues or twelve avenues intersect, to internal spaces within each section, &c. Now, such language presupposes a town actually laid out, and to which it can be properly applied. We must, then, refer to the 27th April, 1807, as the day on which the act of dedication took place.

The next question to be determined is, whether the legislation by the governor and judges, and by the common council of the city of Detroit, reserving to the owners of lots, spaces contiguous to their front lines, was valid; or whether it does violate public rights flowing immediately from the act of dedication. The nature and extent of those rights are, at this day, well understood. A series of judicial decisions made in this country and in England during the last forty years, have defined with great accuracy the rights of the public and of individuals to grounds reserved for public use in a town or city. The extent to which municipal corporations may go in *regulating* the use of grounds dedicated to the public, are also stated with clearness and precision. From the view, however, which I have taken of the question now being considered, I deem it unnecessary to refer to those adjudications for the purpose of testing the validity of the act of May, 1807, and subsequent acts, either of the governor and judges or of the common council, in relation to the spaces of ground allowed to owners of lots and contiguous to their front lines.

Assuming, then, the act of May, 1807, as the lawful exercise of legislative power, let us examine it, with a view to determine how far the defendant can justify the erection complained of, by its provisions. By the first section of the act, ten feet was allowed "for erecting porches in the front of houses, for doors of cellars, for an area to allow light to apartments below the level of the ground, for a grass plat and shrubbery, or for other purposes of utility or ornament, as the inclination and taste of the proprietor may direct."

The right to erect a flight of steps from the street to the second story of a building, is not enumerated in the section. It must rest, then, on the concluding and general words of the section, " or, for other purposes of utility or ornament." But can such a right be deduced from these general words? This can be determined by the application of a few general rules, by which courts are guided in the construction of statutes.

First: what was the intention of the law makers. Upon the ruins of the ancient town of Detroit—a town covering a small space of ground, with narrow streets—was projected another, covering a much larger space, and distinguished, among other things, for the width of its streets, and its magnificent avenues. The town being laid out, its founders proceeded to carry out other objects they had no doubt in contemplation, and provide measures as well to promote the comfort, convenience and health of its inhabitants, as to beautify and adorn it. These objects were sought to be attained by the act of 18th May, 1807. The side-walks of Woodward avenue being twenty feet wide, ten of those twenty feet were allowed to be used for purposes coming within the purview of the act. The governor and judges assuming that they had the right, allowed porches to be erected. These constructions, it was supposed, would not only contribute to the comfort and convenience of the citizens, but add, if attention was paid to architectural taste, to the beauty of the town. Doors for cellars, if properly placed, while they could not interfere with the public uses to which the street was dedicated, might prove a great convenience: as a means of allowing light to enter apartments below the surface of the ground, it might be defended on the ground of both health and convenience: its use as a grass plat or for shrubbery would obviously contribute to the health and comfort of the inhabitants, and to the beauty of the city.

The People *v.* Carpenter.

Are we permitted, then, to give to the concluding words of the section such a latitude of interpretation as to allow these spaces to be used for purposes inconsistent with the object the law makers had in view? Clearly not. Would it, then, be consistent with the intention of the law makers to allow these spaces to be used for erections like that described in the special verdict in this case? It might, in one sense, be deemed convenient to appropriate these spaces for such purposes; for owners of lots would reap all the pecuniary advantages to be derived from the use of the second story, without diminishing the size of the rooms below. But these spaces were never intended to be used for such purposes. If they were tolerated, what would be the consequences? Why, the business streets of this city, where land has attained a great value, would present, along their entire line, flights of stone steps from the street to the second and third stories of buildings. " Utility," in such a state of things, would hardly be combined with " beauty." Such an inconvenience to the public never could have been intended by the law makers, and never would be tolerated by the public.

But according to a well established rule of construction, the general words " utility or ornament," in the latter part of the section, are to be construed with reference to the particular words which precede them, they may be enlarged or restrained in their meaning, so as to make each part of the section consistent with every other part; this is but another mode of arriving at the intention of the law maker.

For the purposes of ornament, the spaces are authorized to be used for a grass plat or for shrubbery: the word " ornament," then, is to be so construed with reference to the *kind* of ornament specially enumerated—it would not justify the use of those spaces for purposes of ornament not fairly deducible from the words, " grass plat or shrubbery." The same rule will apply in giving a construction to the word " utility." The legislature, in the previous part of the section, have indicated what they intended by the use of that word; and it must be controlled and limited in its meaning by the various objects of utility specified in the section. For instance, a *porch* is authorized. Now, it is not contended that the owners of lots are confined particularly to erections called porches: any other erection of a similar nature, and used for similar purposes, would fall within the meaning of the word *utility.*

At all events, the erection must bear a nearer relation to a porch, than the flight of steps described in the special verdict. I think it is fair to conclude that the objects of utility or ornament authorized by the law are such, and such only, as may contribute to the convenience, comfort or health of owners of lots, provided they do not annoy the public or mar the beauty of the city.

The act of 1807 continued in force until the 7th November, 1815. The erections authorized by the first section of the former act, were limited by the latter act to fifty inches in height, except as to "a porch or gallery." The act also provided, that "every person placing a fence or paling, not exceeding fifty inches in height, on the front line of the ten feet, shall also place another fence or paling on the rear line of said ten feet, along the line of his lot, of at least equal height; and the said ten feet shall not be severed from the street, but the same shall always be considered public ground, notwithstanding the uses that now are, or hereafter may be, permitted to be made thereof: and these regulations shall also apply to the seven feet allowed by a subsequent section of said act, in relation to narrower streets. And the common council of Detroit may, at any time, make additional provisions for the effecting the object of this law: Provided, that no laws that are or may be passed on these subjects, shall ever confer any vested right or title, or in any manner impair the public authority to regulate the said ten feet or seven feet, as may be found expedient."

If any doubts existed as to the correctness of the views I have expressed upon the question now under consideration, this act would remove them. It repels the idea suggested by counsel, that the law of 1807 was the dedicatory act. The first section of the act of 1815 refers to the "ten feet *regulated* by the first section of an act entitled 'An additional act concerning the town of Detroit,'" passed May 18, 1807. It is manifest, then, that the act of 1807 was merely intended to *regulate* the use of the streets in a town *already* laid out and established. It is a legislative construction of the act of that year, which, in a doubtful case, would be conclusive upon us. That it was intended to *vest rights* in the proprietors of lots, is repelled by the language of the first section of the act of 1815. The governor and judges had probably discovered, that what was originally granted as a boon, had in process of time come to be considered as having ripened into a *right*. The evil

consequences of such a doctrine were foreseen, and hence the clear, strong, and explicit terms in which it was repudiated.

This concludes the legislation of the governor and judges on this vexed question.    It is probable that the acts of 1807 and 1815 were regarded as binding and obligatory by the local authorities of the city. Under either the latter act or the general powers conferred upon the common council by the charter of the city, that body, in the revision of 1836, limited the space allowed for proprietors to *seven* feet, in streets of the width of 120 feet.    As a condition to the use of such spaces, however, they were required to be " enclosed or paved with flat or round stone or brick."    The ordinance of 1842, entitled " An ordinance relative to side-walks," provides in the second section, that " on streets of the width of 120 feet and upwards, any projection shall not extend more than seven feet, except Washington avenue, which shall not exceed ten feet."

These ordinances are to be construed with reference to other laws or ordinances on the same subject matter·    Neither of them specifies the purposes for which the spaces allowed by them respectively should be used.    We can account for this circumstance only upon the supposition that the acts of 1807 and 1815 were regarded as in force.    The ordinance of 1836 provides that such spaces " shall either be enclosed or paved with flat or round stone or brick," &c.    Such language is inapplicable to a space used for a projection like that complained of.    But this ordinance was repealed by the ordinance of 1842, which does not confer, in absolute terms, a right: it simply provides that " any projection shall not extend more than seven feet."    This language would seem to imply that the right to these spaces was already conferred, and that the object of the provision was merely to restrict it to seven feet. This view is fortified by the terms of the third section, which provides that " that part of the respective side-walks lying outside of the line, to which projections as aforesaid are *allowed* to extend, shall not be obstructed or encumbered."

Assuming that the common council acted with reference to the acts of 1807 and 1815, we are enabled to account for the language employed in the ordinance of 1842.    While it reduces these spaces in streets of the width of 120 feet, to seven feet, it is entirely silent as to the uses to which they might be devoted.    We can only account for

this omission on the ground that this was supplied by the act of 1807, as modified by that of 1815. We cannot suppose that the common council would grant the use of ground, included in one of the most important streets, in a commercial point of view, in the city, without so guarding the grant as to protect the public from inconvenience.

As the erection in question, then, is not justified either by the acts of 1807 or 1815, assuming those acts to be yet in force, or by the ordinances of the city, of 1836 or 1842, we are to regard the steps as an obstruction in a public highway, without any legal authority; and the only remaining question to be determined is, whether the special verdict contains such a statement of facts as will authorize us to give judgment against the respondent.

Chancellor Jones, in an elaborate and very able opinion in the case of Seward *v.* Jackson, 8 Cowen 406, says: "It is of the essence of a special verdict, that it should be a finding by the jury of the facts on which the court is to pronounce the law, and not the evidence of the facts upon which it is the province of the jury to adjudicate." The court applies the law to the facts, but have no power to decide upon evidence: this is the province of the jury. These rules lie at the foundation of our system of jurisprudence, and should be kept steadily in view; otherwise we are in danger of blending two jurisdictions which are entirely distinct.

The rule laid down by Chancellor Jones is sustained by the elementary works on practice. Tidd, 897-8, says: "It is a general rule, that in a special verdict, as nothing is to be intended, the jury must find facts, and not merely the evidence of facts." Again: "And if a special verdict, in a mixed question of law and fact, find facts, from which the court can draw clear conclusions, it is no objection to the verdict, that the jury have not themselves drawn such conclusions, and stated them as facts in the case."

In the case before us, the material facts found by the jury are: 1 That the governor and judges, pursuant to the act of congress of April 21, 1806, adopted a plan and laid out the city of Detroit, on the 13th and 27th of April, 1807, including the road or avenue known as Woodward avenue: 2, That from that time to the present, the road or avenue has been used and travelled as a highway: 3, That the defendant did erect on the side-walk, within the limits of the said avenue, a

The People *v.* Carpenter.

flight of steps fifteen feet high and three feet eight inches wide: 4, The jury also find that various ordinances have been passed by the city authorities in relation to side-walks, projections and spaces in the streets of said city, all of which they make part of their verdict. The jury then conclude as follows: "If upon these facts, under the laws of the state and the said ordinances of the city of Detroit, the court shall be of the opinion that the said steps are a *nuisance*, then the jury find the defendant guilty; otherwise not guilty."

Can the court pronounce judgment upon such a finding? A nuisance is defined by Blackstone to be, "the doing of a thing to the annoyance of the king's subjects." 4 Black. Com. 167. In the case before us, the *thing done* was the erection of the steps mentioned in the verdict: whether *the thing* thus done *is an annoyance* to the inhabitants of this state, is referred by the jury to the determination of this court.

There are a class of cases where the finding of a jury in respect to *the thing done*, necessarily includes the other fact: thus, if a person be indicted for keeping a house of prostitution, or a gambling house, and the jury find the fact, the law implies the other fact. And this necessary legal inference is founded on the idea, that from their very nature a house of prostitution and a gambling house cannot be otherwise than an annoyance to the public—a nuisance. The same rule would apply to an indictment against a common scold, or for creating noxious smells.

In all these and the like cases, the indictment need not aver the fact of annoyance; or, if averred, it need not be expressly proved; the conclusion of law supplying the place of such proof. This conclusion of law, however, can only apply to cases where it must, from the nature of things, be universally correct.

Ordinarily, an indictment for a nuisance cannot be supported unless the thing complained of is productive of inconvenience to the public. Thus in an indictment for obstructing a highway, the forms of the indictment given by the elementary works always contain three averments: 1, that there exists a public highway: 2, that it was unlawfully obstructed: and, 3, *that by reason of the obstruction, persons could not pass and repass as they were accustomed,*" &c. The prosecutor, in such cases, must prove *these facts to the satisfaction of the jury before he can ask a conviction.* Arch. Cr. Pl. 482. This *inconvenience*

or *annoyance* to the public enters into the definition of the offence, *and must in all cases be proved.*

These positions are not questioned by the counsel who represents the people; but it is contended that the question of inconvenience is a question of law, arising from the facts stated in the special verdict: that the jury having found that Woodward avenue is a highway, and that the defendant erected a flight of steps, the court can arrive at a certain conclusion respecting the question of annoyance: in other words, that such an obstruction must necessarily be an annoyance to the public.

But to warrant this position, it would seem necessary to establish another,—that every obstruction in a highway is a nuisance. The reasoning of counsel is, that the public have a right to the use of every part of the highway; and, having this right, any obstruction must be a nuisance. As a general legal proposition, it is true that the public have a right to use every part of a common and public highway; but it by no means follows, that *every obstruction is necessarily a nuisance.* The entire line of Jefferson avenue exhibits obstructions, some of which may present as serious obstacles to the use of the whole of the highway, as the steps in question. Trees, awning-posts, hay-scales and hydrants meet the traveller at every step, and yet no one regards them as nuisances. It may be said that the health or convenience of the public is promoted by such erections. This is very true, but in determining whether an obstruction in a highway is a nuisance, the advantages or disadvantages to the public are not to be taken into the account in determining the question of guilt or innocence.

But let us test the correctness of the theory of counsel by other examples. It is common for individuals to erect platforms in front of their residences, to subserve their convenience in getting in and out of carriages. Suppose a person indicted for obstructing the highway, and the obstruction should consist of one of these platforms, which are reached by steps, and are usually two or three feet high, and three feet wide: would the prosecutor deem it safe to rest, after proving the existence of the highway and the obstruction? It is apprehended that he would not, and that further proof would be required to show that the *obstruction* was an annoyance to the public. On the trial of such an indictment, it would be entirely competent for the defendant to introduce

proof showing that, from its position, the erection did not and could not annoy the public.

Now, such erections oppose as effectual a barrier to the traveler as the steps in question; yet it could hardly be contended that the legal presumption of annoyance to the public would be so conclusive as to preclude the possibility of its being overthrown by proof. Again: in streets where the principal commercial business of the city is transacted, and which are most likely to be thronged with people, obstructions of various kinds are to be found, such as signs, projecting windows, and the like; and where the ground descends, as from Jefferson Avenue to the river, large stone steps are placed in front of doors to facilitate an entrance. It is conceived that such obstructions are not considered, in law or in fact, as nuisances; and yet, the use of the streets where such projections exist are as effectually obstructed as Woodward Avenue is by the steps in question.

These illustrations show that the rule sought to be enforced, that every obstruction in a highway is a nuisance, cannot be sustained. Whether an obstruction be a nuisance, must, then, be a question of fact for a jury, and not of law for the court. It may be that the steps in question furnish strong and almost conclusive proof that the rights of the public are violated: if so, a jury, under proper instructions from a court, would so find.

In the case of Hart *v.* Mayor &c. of Albany, 3 Paige 218, Chancellor Walworth uses this language: " The question of nuisance or no nuisance, however, is always a question of fact, in relation to which the opinions of individuals will necessarily differ." In the same opinion, the chancellor asserts, that " *prima facie* the person who appropriates any part of a public street or harbor exclusively and permanently to his own use, without the consent of the legislature or the municipal authorities, is guilty of a nuisance; and he subjects himself to the burden of proving that it is no injury to the public, and that a public right has not been violated."

I am unable to reconcile these views: if the question of nuisance or no nuisance be a question of fact, it properly belongs to a jury to determine that fact. But, according to the clause in the opinion of the chancellor, last quoted, any person who appropriates a part of a street permanently to his own use, is, *prima facie*, guilty of a nuisance: that

is, the obstruction being proved, the law presumes a violation of public right. How can such a rule be sound, if, in the language of the chancellor, the question of nuisance or no nuisance be one, "in relation to which the opinions of individuals will differ."

The definition of a nuisance necessarily implies annoyance or inconvenience to the public: this annoyance or inconvenience is the ground of complaint, and is a question of fact; if so, the burden rests on him who makes the complaint to prove the fact. If the fact is to be presumed on proof of the obstruction, then every obstruction must necessarily be a nuisance; but I have endeavored to show that every obstruction in a highway is not necessarily a nuisance, and if I have been successful in establishing this proposition, then there is no foundation on which the legal presumption can rest. It is very true, the chancellor does not consider the presumption arising in the supposed case absolute and conclusive, but liable to be overthrown by proof to the contrary. The burden of proof is merely changed; but even this view cannot be sustained unless it be *universally* true that every obstruction placed in a highway is a nuisance: and that cannot be universally true in relation to which men may reasonably entertain different opinions. Presumptions, in such cases, must be presumptions of fact, and, in the language of Lord Mansfield, "the court cannot presume a fact."

The true rule on this subject, is, that where the act done is in its own nature an offence, no consequences need be averred in the indictment; but where the act done is not in its own nature an offence, consequences must be stated and proved. The cases to which the law applies the *presumptio juris et de jure*, are fully stated and reviewed in the case of Tanner v. Trustees of Albion, 5 Hill 121.

A brief review of some of the cases cited by the counsel for the people, in support of the rule, that an obstruction being once proved to be in a highway, the injury to the public follows as a *necessary presumption of law*, will conclude this opinion.

In the case of Arundel v. McCulloch, 10 Mass. 71, it appeared that a bridge was erected across an arm of the sea, and that the defendant, to facilitate the passage of a vessel, removed it, doing as little damage as possible to effect his purpose. The court held, that the defendant was not liable in trespass, as the arm of the sea was a public highway,

and no authority had been granted to obstruct its navigation by a bridge; and that "when any public way is *unlawfully* obstructed, any individual who wants to use it in a public way, may remove the obstruction." The *unlawfulness* of the act was shown by the fact that the defendant could not navigate the river in consequence of the obstruction. This case, then, does not prove the rule laid down by counsel.

The case of Pierce *v.* Dart, 7 Cowen 609, shows, that in an action for obstructing a highway, the plaintiff is bound to show that he sustained some injury.

The case of Hart *v.* Mayor &c. of Albany, 9 Wendell 571, contains noting inconsistent with the views I have expressed. Mr. Justice Sutherland, in the course of his opinion, uses the following language: "This float, if permanently moored and continued in the open part of the river, *thereby rendering the navigation less safe and convenient*, would, I apprehend, most clearly be a public nuisance, liable to be indicted as such, or to be abated without indictment by any individual who might be injured or aggrieved by it. It certainly is not less a nuisance, if the views I have expressed are correct, for being placed within the basin." Again: "If the complainants can moor a *floating store house* in the basin, it is not perceived why they may not erect a more permanent building, with its foundation in the bottom of the basin. It is very immaterial to the public how far either below or above the surface of the water the obstruction reaches: *it impedes the navigation*, or other use of the basin, neither more or less on that account." These views are warranted by the case made by the answer, which showed, in contradiction of the bill, that the float was *an obstruction to the free navigation of the basin.*

In the case of Rex *v.* Russell, 6 East. 427, it appeared on the trial, that the wagons mentioned in the indictment occupied one half the street, "so that no carriage could pass on that side next the warehouse, though two carriages might pass on the opposite side, the gutter being in the middle of the street; that the wagons were loaded and unloaded in the street, and the packages thrown down on the same side of the street, so as frequently, with the wagons, to obstruct even foot passengers, and oblige them to cross the gutter to the other side." These being the facts proved on the trial, a verdict of guilty against the defendant

was sustained. The court say, "that the primary object of the street was for the free passage of the public: and any thing that impeded that free passage without necessity, was a nuisance." The *free passage* of the street having been shown by the facts on the trial, *as well as the inconvenince* to which the public had been subjected, no question could arise as to the correctness of the verdict.

The same remark applies to the case of Rex *v.* Cross, 3 Camp. 227. *It was proved* on the trial, that, by the acts of the defendant, "private carriages could very rarely be drawn up to the opposite houses, and considerable difficulty was experienced in passing along that side of the street." The annoyance, therefore, to the public was manifest, and no doubt could be entertained of the legality of the conviction.

In Rex *v.* Russell and others, 13 Eng. C. L. 254, the defendants were indicted for a nuisance in a navigable stream. The majority of the court held, that if the erection was for a public purpose, and produced a public benefit, and if the erection was in a reasonable situation, and a reasonable space was left for the passage of vessels on the river, then the defendants ought to be acquitted. From this opinion, Lord Tenterden dissented, and held, that the questions submitted to the consideration of the jury were not raised by the indictment: that the question properly arising was, "whether the navigation and passage of vessels on this public river (Tyne) was injured by the erections? upon this question there was evidence on both sides," &c. If this opinion be correct, as I think it was, it is quite clear that proof of the erection, in and of itself, would not furnish sufficient evidence to support the indictment, unless accompanied by other proof, *that the navigation and passage of vessels on the river was injured.*

In the case of King *v.* Ward, 31 Eng. C. L. 92, the rule is explicitly recognized, that the question of nuisance or no nuisance is a question of fact for the jury. Lord Denman, in the course of his opinion, after quoting from a remark of Lord Hale, that "all nuisances and impediments of passage of boats and vessels, though in the private soil of any person, may be punished by indictment," observes: "There is no incongruity in his (Lord Hale) afterwards asserting that the question of nuisance or no nuisance is for the jury: so Lord Tenterden considered it in Rex *v.* Russell, and gave the form in which he thought it ought to be submitted to them; and that is precisely the course taken

on the trial of this indictment." From the report of the case, it appears that the jury, after deliberation, stated that *an impediment had been created;* with this, however, the chief justice was not satisfied, for the reason that such a finding " was not equivalent to the word nuisance:" whereupon the jury " said at length that they considered it to be a nuisance."

The case of the Commonwealth v. Wilkinson, 16 Pick. 175, does not raise the question I am now discussing. The only question raised in that case was, whether the defendant, who was indicted for continuing certain buildings within the limits of the highway, could show that that portion of the road covered by the buildings was not within the traveled part thereof. Of the correctness of the ruling of the court there can be no doubt. No person is authorized so to appropriate any portion of a highway, as to interfere with the rights of the public.

In the case of Hopkins v. Crombie, 4 N. H. Rep. 520, the supreme court of New Hampshire, in considering the question, whether every encroachment on a highway is *ipso facto* a nuisance, held that " the question whether anything within the limits of a highway is to be deemed a nuisance, is a question of fact, to be settled by a jury."

The case in 2 Watts' R. 23, was referred to as sustaining a contrary doctrine. I have examined that case, and am unable to perceive how it conflicts with the case of Hopkins v. Crombie. A building had been erected on a public square; and in the course of their opinion the court say : " The points, then, in this cause may be narrowed down to a question of fact. For if the jury believe, from the testimony, that these buildings' were erected on the public square, although their limits and extent have not been precisely defined, they are a public nuisance."

Looking to the purposes for which public squares are usually dedicated to the public, it would seem to be a necessary conclusion, that the erection on such squares of " a stable and shed," would be a nuisance. All that can be gathered from the case, however, is, that upon the trial of a cause, it would be the duty of the court so to instruct the jury, who, after all, determine the question of nuisance or no nuisance.

The case of the Commonwealth v. Passmore, 1 Serg. & Raw. 217, is more in point ; and that it sustains fully the principle for which I contend, will appear by quotations from the opinion of the learned chief justice. He says: " The defendant has been indicted for a nui-

sance in placing goods on the foot-way and carriage-way of one of the public streets of the city, and suffering them to remain for the purpose of being sold there, *so as to render the passage less convenient,* although not entirely to obstruct it."

It is a fair inference, then, that if the acts of the defendant had not the effect to " render the passage less convenient," he would not be guilty of a nuisance.

The case of the State *v.* Caldwell, 2 Speer's R. 163, would come better recommended as authority, if the facts, which it is said were all submitted to the jury, had been reported, and the opinion of the court of appeals had developed the reasoning by which the decision of the inferior court was sustained. That opinion simply affirms, that the court were satisfied with the instructions given to the jury, and with their finding.

Without extending my review of cases any further, I am of the opinion that the verdict of the jury does not embody such facts as will authorize this court to pronounce judgment. The case must be remanded, with instructions to issue a venire de novo.

Although the validity of the acts of 1807 and 1815, and of the several ordinances of the city of Detroit, are not necessarily involved in the decision of this cause, it may not be improper, inasmuch as their validity was drawn in question and fully·discussed, to say, that neither the governor and judges nor the common council of the city of Detroit had, or have, any power or authority to grant the exclusive use of any of the streets or alleys to individuals. Such a use is inconsistent with the rights acquired by the act of dedication. Rights thus acquired are vested rights, protected by the constitution of the United States; and it is not, therefore, competent for the legislative power of the state, much less of the common council of the city, to pass any act or ordinance which shall in any wise impair or defeat those rights. The powers of the city authorities are restricted to the *regulation* of the streets: this is a necessary power, and one which, if wisely exerted, cannot fail to prove highly beneficial to the community; but the power to *regulate* streets does not include the power to pass ordinances which shall affect injuriously public or private rights. The common council are, to some extent, the guardian of those rights: as such, it becomes them duly to employ all the powers with which they are vested, to purify the streets

of the city, and to cause all obstructions not warranted by law or ne-
cessity to be removed. The adoption of such a policy will remedy the
mischiefs that have grown up under a course of legislation by which the
rights of the public have been made subservient to the convenience or
cupidity of individuals.

*Certified accordingly.*