STATE v. SHERWOOD HIGGS.

(Decided March 27, 1900.)

*Raleigh—Store Signs, When Removable by City Authorities, When Not.*

1. Where a store sign amounts to an obstruction which tends to hinder, delay incommode or in some way endanger the use of the sidewalk by pedestrians in passing and repassing, its removal can be enforced by the city authorities by virtue of their granted powers, and their police powers.

2. An abutting owner to a street and sidewalk has an easement in his frontage, which he may use, in subordination to the superior rights of the public. His placing an ornamental electric sign, securely attached to his building, 14 feet high from the pavement and extending four to four and a half feet across the sidewalk, is not an obstruction—calling it so, does not make it so, and he can not be required to remove it.

INDICTMENT in the Mayor's Court of the city of Raleigh, for failure to take down his sign above the sidewalk in front of his store on Fayetteville street, contrary to the form of a city ordinance, in such case made and provided, tried on appeal before *Hoke, J.,* at January Term, 1900, of WAKE Superior Court. His Honor charged the jury, if they believed the evidence, they should find the defendant guilty.

Verdict guilty.   Defendant was fined $50, and appealed.

The city ordinance, evidence of the State (defendant introduced none), and contentions *pro* and *con* fully appear in the opinion of FURCHES, J., and in the dissenting opinion of CLARK, J.

*Mr. R. O. Burton,* for appellant.

*Messrs. Attorney-General,* and *Watson & Gatling,* for the State.

FURCHES, J.   This is a prosecution commenced before the Mayor of the city of Raleigh for an alleged violation of an ordinance of the city.   The ordinance under which the defendant is indicted is as follows:

"SECTION 1. That no sign shall be suspended or projected over the sidewalks in the city of Raleigh.

"SEC. 2. That all signs that are now projected or that are suspended over the sidewalks of the city of Raleigh shall be removed, together with the rods and poles used for suspending or swinging said signs, by the 15th day of August, 1899.

"SEC. 3. Any person or firm violating the provisions of this ordinance or failing to comply with the provisions of the same, shall, upon conviction before the Mayor, be fined fifty dollars, or imprisoned thirty days."

The Legislature of 1899, chap. 153, Private Acts, enacted a new charter for the city of Raleigh, and our attention is called to the following provisions therein for the purpose of showing the power of the city, which, the State contends, authorized the charge of the Court and the verdict of the jury in finding the defendant guilty.

Sections of the charter:

"SEC. 33. That it shall be the duty of the Aldermen to attend all the meetings of the Board unless unavoidably pre-

vented from doing so, and when convened, a majority of the
Board shall have power to make and to provide for the execu-
tion of such ordinances, by-laws, rules and regulations, and
such fines, penalties and forfeitures for their violation as may
be authorized by this act, consistent with the laws of the land
and necessary for the proper government of the city: *Pro-
vided*, that no penalty prescribed by the Board of Aldermen
for the violation of any of the provisions of this act, or of any
ordinance, by-law, rule or regulation made in pursuance
thereof shall exceed fifty dollars fine or thirty days imprison-
ment."

"SEC. 80. That all penalties imposed under the provisions
of this act or of any ordinance, by-law or regulation of the
city, unless herein otherwise provided, shall be recoverable in
the name of the City of Raleigh before the Mayor; and all
such penalties incurred by any minor shall be recovered from
the parent, guardian or master, as the case may be, of such
minor."

"SEC. 34. That among the powers conferred on the Board
of Aldermen are these: * * * Ascertain the location,
increase, reduce and establish the width and grade, regulate
the repairs and keep clear the streets, sidewalks and alleys
of the city; extend, lay out, open, establish the width and
grade, keep clean and maintain others; establish and regulate
the public grounds, including Moore Square, Nash Square and
Pullen Park, have charge of, improve, adorn and maintain
the same, and protect the shade trees of the city."

"SEC. 38. That they may require and compel the abate-
ment of all nuisances within the city, or within one mile of the
city limits, at the expense of the person causing the same, or
the owner or tenant of the ground whereon the same shall
be;" * * *

Subsection 6 of sec. 79, provides:

"(6) Any person  *   *   *  ; or who shall excavate, construct, build, use, keep or maintain any cellar, basement, area, passage, entrance or way under any sidewalk, or build, construct, keep, use or maintain any veranda, piazza, platform, building or stairway or other projection or construction upon or over any sidewalk in the city whereby the free and safe passage of persons may be hindered, delayed, obstructed, or in any way endangered,   *   *   *   without having first taken out a license therefor;   *   *   *   shall be guilty of a misdemeanor, and upon satisfactory proof before the Mayor, shall be adjudged to pay for every such offense a fine not exceeding fifty dollars, or be imprisoned not exceeding thirty days."

The sections in the charter are not produced *seriatim,* but as they are presented in the brief and argument of counsel who represented the State.

Upon the trial the State introduced the charter and the ordinances of the city, and the following evidence:

The State then introduced Chief of Police Mullins, who testified that a written notice from the Mayor to take down his sign was served on defendant before the beginning of this proceeding, which notice was put in evidence. That the sign was not taken down, and is still up. On cross-examination, the witness stated that the sign was an electric sign, which spelled out Higgs's name by the passage of a current of electricity; that it was an ornament to the street, and did not interfere with passage or vision; it was at its lower end about fourteen feet above the sidewalk, projected four or four and a half feet from building, was twelve to fourteen feet long, about eighteen inches wide, made of plank, and apparently a very heavy one; was fastened at the top to a bar of railroad iron and at the bottom to a round bar of iron.

The sign itself hung vertically, and he thought it was as practically secure as the house itself. Did not think there was any danger of falling or being blown down. Had never examined closely the fastenings to the bar of railroad iron. Witness identified the photograph of the sign, which was put in evidence, and which was taken before the lower swinging signs on the street were taken down. The sign which Higgs had swinging to the lower rod, as shown in the photograph, was taken down by him before this proceeding was started. The lower rod was also cut off at the end.

Witness said it was still common for porticoes or balconies, awnings and signs on awnings, and signs on the outer railing of balconies, and signs projecting a few inches over the sidewalks, to exist. There are many of them in the city. There are balconies in front of many buildings on Fayetteville street, projecting over sidewalk three to four feet. One over Yarboro House, Henry Building (with J. M. Broughton & Co.'s sign on outer railing, also Foller, the tailor's), one over A. B. Stronach's, with his sign on outer railing. Many awnings in the city which cover the entire sidewalk—some of wood, some of cloth, some signs on cloth, as Berwanger's, stretching clear across sidewalk, and some on wood, as W. B. Mann's, at edge or side of awning, and extending over street. Some other signs were allowed to sit on sidewalks, as Watts, the barber. A great many signs on the doorfacing, which project a few inches over the sidewalk, as R. B. Raney's, Raleigh Savings Bank, Boylan, Pearce & Co., W. E. Jones, a member of the Board of Aldermen, Cross & Linehan; Jones & Powell have steps leading from Fayetteville street down into their cellar. On each side of cellar is an iron railing and till recently they had suspended on the railing an ice and coal sign. W. H. King & Co.'s drugstore projects above some distance over sidewalk and a sign is painted on it,

as shown from the photograph. Y. M .C. A. building has steps in street.

W. Z. Blake, Street Commissioner, was introduced by the State, and testified that he measured that morning the distance from the front wall of Higgs's store to center of street. It was 49½ feet.

The State then introduced the charter of the City of Raleigh, as contained in chap. 153, of the Private Acts of 1899, and thereupon rested its case.

The defendant's counsel contended that the ordinance was void; that on the evidence he was the owner to the center of the street, subject to the easement of the public, and had the right to make the customary and proper use of his property; that he was discriminated against,and that the ordinance was unreasonable and arbitrary and oppressive; that the Board of Aldermen had no power to adopt it, especially in its form and to the extent they claimed, and that it was an attempt to create a criminal offense, which they had no power to do.

His Honor charged the jury that if they believed the evidence, they should find the defendant, guilty. Verdict guilty. Defendant excepted and appealed from the judgment pronounced.

There was exceptions taken on the argument to the jurisdiction of the Mayor of the city to try the case, if the defendant was guilty of a criminal offense, for the reason that he was given exclusive jurisdiction. It was also contended that the ordinance was void for uncertainty, for the reason that it gave the Mayor the discretion to fine the defendant upon conviction fifty dollars, or to imprison him for thirty days. We do not think either of these objections can be sustained. Art. IV, sec. 14, of the Constitution, expressly provides for the establishment of such courts for the trial of misdemeanors in cities and towns; and the charter of the city of

Raleigh, sec. 79, sub-sec. 6, expressly constitutes the Mayor a court for the trial of misdemeanors committed within the city, when the punishment does not exceed a fine of fifty dollars or imprisonment for thirty days. It would, therefore, seem that the Mayor had jurisdiction, unless the ordinance is void, for the reason that it gives the Mayor exclusive jurisdiction, and takes from Justices of the Peace their constitutional rights. But without discussing that question, we are of the opinion that it is not presented in this case, as it must be conceded that the Mayor has a co-ordinate jurisdiction, if not the exclusive jurisdiction; and that is all that is necessary to be established to give him jurisdiction of this offense, if it be an offense. Sec. 3818, of The Code, gives to Mayors the jurisdiction of Justices of the Peace, therefore he had jurisdiction outside of the charter.

Neither do we think the ordinance is void for uncertainty in its penalty or punishment. The ordinance of the city limits the punishment to $50 fine or thirty days imprisonment; and sec. 3820, of The Code, makes the violation of a city ordinance a misdemeanor, and limits the punishment to a fine not to *exceed* fifty dollars, or imprisonment not to *exceed* thirty days. This is the exact language of the Constitution, and therefore can not be unconstitutional, as applied to misdemeanors. It seems to us that it must follow that the ordinance is not void for uncertainty, and, if not void for uncertainty, its violation was a misdemeanor unless it was void for other reasons than for uncertainty in its punishment. But if it was void for any reason, it was not unlawful to refuse to obey it, and its violation was no criminal offense.

But the ordinance may not be void (and we do not say that it is) when properly construed, and the defendant still not be guilty. And it seems to us that it has not been properly construed in the trial of this case.

Whether the Legislature could in express terms authorize the city to require the defendant to take down this sign, by the passage of an ordinance, or be guilty of a criminal offense, we very much doubt.    But it is not necessary that we should pass upon that question, as we do not consider that it has attempted to give the city authorities that power.    And we therefore consider the question from that view of the case, as it must be admitted that they had no such right unless it is given them in the charter of the city.

A municipal corporation is a creature of the Legislature, and only has such powers as are expressly given it, or such as are incident to the powers expressly given and necessary to the execution of the express powers.    It seems to be conceded that they had no *express* power to pass an ordinance requiring the defendant to take down this sign.    And we do not mean to say by this that the city authorities undertook to pass a personal ordinance requiring the defendant to take down his sign, but to say they had no express authority to pass a general ordinance requiring all such signs as his (if there are others) to be taken down, the violation of which would be *per se* a misdemeanor.

But the State contends that the city had express authority to open and grade streets, and clear and keep clear the streets and sidewalks of all obstructions; that the city is the owner of the streets and sidewalks, *cujus est solum ejus est usque ad coelum,* and that the city authorities have the absolute right to remove any permanent fixture upon or over the streets or sidewalks; that they have the same rights of property over the sidewalks of the city that a private citizen has over his land; and, having this right, they have the right by the exercise of their arbitrary power to require the defendant to take down his sign.

The fallacies of these contentions are that the Mayor and

STATE *v.* HIGGS.

Aldermen of the city of Raleigh do not own the streets and sidewalks; that while the fee may be in the city it is held in trust for the use and benefit of the public. And the Mayor and Aldermen are but the agents of the city to look after the condition of the streets and sidewalks for the use and benefit of the public, and they have no power arbitrarily to do anything which interferes with the right of the citizen that the public has not, and can not have any interest in.

But the defendant, besides his general interest which he has in common with the public generally, is an abutting owner to this street and sidewalk, and, in this way has a special property—an easement in his frontage upon the street. *White v. Railroad,* 113 N. C., 612; *Moose v. Carson,* 104 N. C., 431; *Yates v. Milwaukee,* 10 Wall. (77 U. S.), 497.

This seemed to be conceded as a general proposition. But the State undertook to distinguish this case and take it out of the general rule, by alleging that the city of Raleigh was the owner in fee of the street, and, for this purpose has inserted in its brief the acts and ordinances locating the city of Raleigh. And while they might have been introduced on the trial (Dillon on Mun. Corp., sec. 83), they were not introduced, and we must be governed by the record. But lest it might be inferred that had they been introduced in evidence, that our judgment would have been for the State, we think it best to consider the case as if they had been introduced.

Had they been introduced, we are unable to see that this would have affected the status of the parties, or would have in any way affected the conclusion at which we have arrived.

We have assumed that the city was the owner in fee and sold to the defendant, or those under whom he claims, the lot he now occupies, abutting on Fayetteville street, and, by this sale and purchase, the defendant acquired the right of an abutting land owner—an easement—which is more than that

of the general public; but subject to the lawful government of the city, so far as it is *necessary* for the use and benefit of the public.    The case of *Moose v. Carson, supra,* cited by the State to sustain its contention, we thinks sustains the position taken by the Court.

Then, was it necessary for the public benefit—for the public convenience, the public safety—that this sign should be removed? If it was, then the city authorities under their granted powers would have the right to remove it.    This power would then be one of the powers, incident to their express powers granted to them over streets and sidewalks of the city for the *benefit of the public;* while, on the other hand, the defendant had the right of an abutting owner—an easement—the right to use his frontage for the benefit of his property, as he pleased, in such a way as not to interfere with the rights of the general public, in safety, using the sidewalk for the purpose of travelling the same on foot, and for passing and repassing.    And if his sign in no way impeded or tended to impede such travel, or in no way endangered the safety of such pedestrians in passing over the sidewalks, as they were wont to do, then the city had no right to require him to take it down; and it was no offense in the defendant to refuse to do so; and he would not be guilty of any criminal offense.    It is only the violation of a legal ordinance that is a criminal offense.    It is only to valid and lawful ordinances that sec. 2820, of The Code, applies.

While we have been so far discussing this case upon general law and general principles, we do not believe that a fair and reasonable interpretation of the charter goes further, or was intended to go further, or to authorize the city fathers to do more than we have said they could do.

It provides in paragraph 6, of sec. 79 (after enumerating other things), "or other projection or construction upon or

over any sidewalk in the city, whereby the free and safe passage of persons may be hindered, delayed, obstructed or in any way endangered." Therefore, to our minds, it is manifest that this paragraph of the charter is qualified and restricted, and that the obstruction (if we may call it such) must be such as will hinder, delay, obstruct or in some way endanger the use of the sidewalk (or at least tend to do so) to the use of pedestrians in passing and repassing upon it.

According to the evidence in the case, no one of these conditions is present. The sign is fourteen feet above the sidewalk, and of course can not be an obstruction to pedestrians, and it is shown to be perfectly secure, and in no danger of falling.

But the State contends that the charter (sec. 79, paragraph 6) authorizes the Aldermen to condemn this sign and to require its removal, and that they have done so, and that defendant was properly convicted. We do not think so. We are of the opinion, as we have said, that a fair and reasonable interpretation of the statute does not sustain the State's contention. But if there are doubts as to its construction (and we do no think there are), they must be resolved against the power and against the State, as its right depends upon this power. 2 Dillon Mun. Corp., sec. 91; *Slaughter v. O'Berry,* at this term.

The governing bodies of cities and towns are vested with what is known as police powers, and they may do many things under and in exercise of this power. But, still, they must act within the scope of their delegated powers, or their acts are *ultra vires* and void. They can not do what they are not authorized to do by their charter or by the general law of the land. If a thing within itself is not a nuisance, they can not make it so by saying it is. If a sign hanging four feet from the wall of defendant's store building, firmly attached

to the same, and fourteen feet above the sidewalk, is not an obstruction to footmen on the sidewalk, the city authorities can not make it so by saying it is. And if this sign is securely attached and fastened to the building by iron bars and fastenings so that there is no danger of its falling, the city authorities can not make it dangerous by saying it is. *State v. Webber,* 107 N. C., 962; *State v. Taft,* 118 N. C., 1190; Dillon, *supra,* sec. 87. The State must show the power or the ordinance is void. Cooley Const. Lim. (4th Ed.), 236. This question of overhanging signs has been elaborately and ably discussed in *Goldstraw v. Duckworth,* 5 Q. B. Div., 275, and very much the same views are taken in that case, as to such signs, as are taken in this opinion.

But it is said by the State, among many arguments it makes for the support of the judgment below, that to hold that the city had not the power to have this sign taken down, would destroy all city government. We do not think so. But if the law is so written, it must be so held, though it should have that effect. But it must be kept in mind that the power of the city government is not all that is to be considered in deciding this case. The rights of individual citizens are also to be considered, and they are of equal importance, and probably more in need of the protection of the courts than the Mayor and Board of Aldermen of the city of Raleigh.

The Court holds that, upon the evidence in this case, the Court below should have instructed the jury that, if they believed all the evidence, the defendant was not guilty. But if there had been evidence tending to show that the sign was an "obstruction" to footmen on the sidewalk, or tending to show that it was dangerous to the travelling public, it would have been the duty of the Court to submit the question to the jury upon proper instructions. *Howard v. Robins,* 1 N. Y., 63; *People v. Carpenter,* 1 Mich., 287. And to this it is

65——126

replied that this would be destructive of all city government, to leave such questions to the jury. We do not think so, but as we have said, if it is the law, it must be so held, let the results be as they may. But, as between a jury, under the restraints of an oath, and the instructions of a Judge, we think the citizens' rights would be more likely to be protected than they would be by the uncontrolled authority of the city government. The boundary between the rights of the citizen and the powers of the Mayor and Aldermen is not very plainly marked, and is easily invaded unless great care is taken. But this line is there, though delicately marked, and it must be found and observed. *Slaughter v. O'Berry,* at this term. While this is true as to many things, there are other rights and duties that the city authorities plainly have. It is plain that they have such powers as are expressly granted, unless they are void as being unconstitutional, or in violation of individual rights as established by the general law of the land. They also have such other powers as are incident to and necessary for them to have and exercise in order to carry out and enforce such express powers as are lawfully granted them. It is their duty to keep the streets and sidewalks in good condition, and to remove such obstructions from the sidewalks as are on them and are manifestly calculated to "hinder delay, or endanger" the ordinary use of said sidewalks. Such obstructions clearly fall within their power, and it is their duty to exercise it in a proper manner. But such things as do not appear to hinder, delay or endanger the public and do not in any way obstruct the sidewalks, they do not have absolute control over. And to give them this right, they must allege and show that such signs or other such things are obstructions, or tend to obstruct, or that they are dangerous to the travelling public.

For these reasons we do not say that the ordinance is abso-

lutely void, because if the State can show that the sign is dangerous to the public, the city authorities had the right and it was their duty to have it taken down. And in such event the defendant would be guilty of a violation of the criminal law of the State. But the State must allege and show this, before he is liable. There is error for which there must be a

New trial.

CLARK, J., dissenting. No provision of the Constitution can be found that forbids or even makes doubtful the right of the people of this State, speaking through their representatives in the General Assembly, to authorize the Aldermen or Commissioners of any town or city to forbid the swinging of signs across the sidewalks. Certainly none has been cited. The charter provides in sec. 34: "That among the powers conferred on the Board of Aldermen are these,   *   *   * ascertain the location, increase, reduce and establish the width and grade, regulate the repairs and keep clear the streets, sidewalks and alleys of the city; extend, lay out, open, establish the width and grade, keep clean and maintain others; establish and regulate the public grounds, including Moore Square, Nash Square, and Pullen Park, have charge of, improve, adorn and maintain the same, and protect the shade trees of the city." The title to the streets of a city are in the city for the use of the public. The defendant, an abutting owner upon a street, has no more rights therein than anyone else. He has the right of ingress and egress to and from his store, but so has the public unless he closes it. He has no right to obstruct the view of the street by a sign unless permitted by the city authorities. He has no more right to hang a sign in the street than the city has to suspend anything above his premises. He owns to the line of his lot, but no

farther.  His easement in the street is simply that it shall not be closed up or perverted to other uses.  *Moose v. Carson,* 104 N. C., 431; *White v. Railroad,* 113 N. C., 610. Whatever has been done in the way of hanging signs across the sidewalks in the past, has been by the tacit assent of the city authorities, revocable at will whenever they deem such mode of swinging signs injurious to the appearance of the city.  It would be strange if it were otherwise, seeing that in England, whence we derive our common law, for hundreds of years signs have not been allowed to project over the sidewalks, but are placed flat against the wall of each place of business.  There is probably no town in the United Kingdom, however small, in which signs are allowed to hang across the sidewalk, and the same is true of the countries of western Europe generally.  The same ordinance has been adopted by many cities in this country, and in a few years will doubtless become the general, if not the universal rule. After most diligent research by counsel and the Court, no decision has been found from any court in any country, till now, which denies the power of the town council to pass an ordinance like that now called in question.  The powers of a city government are not restricted to suppressing what is dangerous, but extend to adorning and beautifying the city (when they possess the funds), and to removing from the public streets that which mars their appearance, and equally that which is unpleasant to the eye as that which is disagreeable to the nose. This particular sign may be ornamental, and so may others, but if the Board of Aldermen think the custom of hanging signs over the sidewalk injurious to the appearance of the streets, they could pass this ordinance impartially ordering the removal of all signs hung across the sidewalks.  Now that there is a spirit springing up in favor of beautifying our cities and towns, it is to be regretted that the cold shadow

of a judicial inhibition should fall upon the movement in this State to chill it.

Were a single act, like the hanging out of the defendant's sign, seized upon for its removal as dangerous, or because otherwise a nuisance, then an issue of fact would be raised for a jury.    But when it is an ordinance, impartially ordering the removal of all swinging signs above the street or sidewalk, and the defendant's sign admittedly comes within the words of the ordinance, then it is not an issue of fact for the jury, but a question of the power to pass the ordinance.    The people of Raleigh, acting through their duly elected Board of Aldermen, should certainly be able to decide whether they wished these signs removed or not, and if the Aldermen do not correctly express public opinion, the next Board of Aldermen will permit the swinging signs to go back.    Local self-government demands that much.    The people of any town can decide such questions for themselves better than the courts.    It is hardly to be conceived that any part of the functions of the Supreme Court of a State is to act as a supervisory board of public works to pass upon, restrict or veto the action of the Board of Aldermen of any town upon such matters as the present.

Chief Justice PEARSON, in *Brodnax v. Groom,* 64 N. C., at p. 250, expressed much common sense and a sound knowledge of the true functions of the Court when he said: "This Court is not capable of controlling the exercise of power on the part of the General Assembly or of the county authorities, and it can not assume to do so without putting itself in antagonism as well to the General Assembly as to the county authorities, and *erecting a despotism of five men* (italics in original), which is opposed to the fundamental principles of our government and the usages of all times past."    What the learned Chief Justice said as to "county authorities" has, of

course, the same application to city authorities. In that case the Court held itself incompetent to control the action of the county authorities in building a bridge or in supervising its location or cost or passing upon the necessity for it, because building bridges is a function of the County Commissioners, and not of the Courts. Here, the regulation of the streets, and the removing of what therein impedes their use or impairs their appearance is for the town authorities to decide, and they ought to decide it, subject to correction only by the people of the town at the ballot box, who are the best judges of what is proper and meet as to such matters for their own municipality. The defendant has no property rights in the streets more than anyone else who uses them. His land ends where his deed calls for, i. e., at the edge of the sidewalk next to his store. Whatever privileges he is allowed on the sidewalk or in the air above it, more than belongs to all alike, is a mere tacit license from the town, revocable at its will.

*Moose v. Carson,* 104 N. C., 431, holds that where a town conveys land bounded by a street, it can not afterwards convey away the street itself. *White v. Railroad,* 113 N. C., 610, holds that the abutting proprietor has an equitable easement in the street to the extent that it shall not be perverted to other uses. *Goldstraw v. Duckworth,* 5 Q. B. Div., 275, is a very short opinion construing that the language of a local statute to prevent nuisances upon the pavements of streets was not intended to prohibit projections, like balconies and the like, above the pavements. But neither these decisions, which are the reliance of the defendant, nor any others yet found from any court, sustain the contention that the town authorities do not possess the power to pass the plain unequivocal ordinance (which is here called in question) that "all signs suspended over the sidewalks of the city of Raleigh shall be removed by August 15, 1899." No Court till now

has ever questioned such power, though it has been exercised for centuries in the home of the common law.

On the contrary, in *Tale v. Greensboro,* 114 N. C., 392, it is held: "The courts will not interfere with the exercise of a discretion reposed in the municipal authorities of a city as to when, and to what extent, its streets shall be improved, except in cases of fraud and oppression constituting manifest abuse of such discretion." In that case it was held that the discretionary power over the streets authorized the town council to remove shade trees, against the protest of the owner of the abutting lot. That case cites with approval the following from the United States Supreme Court in *Barnes v. District of Columbia,* 91 U. S., 540: "The authorities state, and our own knowledge is to the effect, that the care and superintendence of streets, alleys and highways, the regulation of grades and the opening of new and the closing of old streets are peculiarly municipal duties. No other power can so wisely and judiciously control this subject as the authority of the immediate locality where the work is to be done." The right to open new and close old streets is certainly greater than the power of removing signs that obstruct the view and impede the circulation of air and light. The right of "superintendence of the streets" thus fully recognized by both courts, extends, like the defendant's ownership of his own lot, *usque ad coelum.* The city authorities are not chained down to surface improvements, but can rise to the level of the occasion.

The ordinance is in the discretion of the city authorities. It is reasonable and impartial. It applies alike to all, and there is no reason why the defendant should be exempted from it. "Equal rights to all, special privileges to none."