RUSSEL (BANK OF COMMERCE v.). See Case No. 884.

## Case No. 12,145.

RUSSEL v. The EMPIRE STATE.

[Newb. 541.] [1]

District Court, D. Michigan. March, 1857.

PUBLIC LANDS — CITY OF DETROIT — STREETS — RIGHT TO BUILD WHARVES—LEASE.

1. Whatever authority the city of Detroit, as a corporation, possessed over the premises in question, to dispose of or lease them, must be derived from the statutes of the United States.

2. The "town of Detroit" was laid out into lots and streets, and public squares, &c., under the act of congress of April 21, 1806 [2 Stat. 398], by the governor and judges; and on the 27th of April, 1807, they fully discharged their trust, and thus was Woodward avenue made a public highway, to the water's edge of Detroit river.

[Cited in The Gem, Case No. 5,303.]

3. By the act of 1842 [5 Stat. 541], "the lands" thus divided and remaining unappropriated under the act of 1806, were vested in the mayor, recorder and aldermen of the city of Detroit, to be disposed of by them, in their discretion.

4. The city obtained no title whatever to the soil of the streets, the fee of which continues in the original dedicator, unless the purchaser of the lots bounded thereby be considered as having the fee, under their respective grants, and therefore cannot occupy them, or give authority for others to do so.

5. Neither the governor and judges, as the old land board, nor their successors, the city authorities, as the new land board, have now any power, beyond that of the regulation of the streets and public squares; and this does not include the right to sell, or lease, or exercise any act of ownership.

6. The city authorities may erect wharves at the termini of their streets, suitable for landing, but by so doing such erections become free to the public, as extensions of the streets, and the city has no authority to exact toll for ingress or egress.

[Cited in The Ottawa, Case No. 10,616; The Maud Webster, Id. 9,302; The Geneva, 16 Fed. 875; The Mary Garrett, 63 Fed. 1,011.]

7. The intention of congress has been clearly manifested by the act of 18th of May, 1796 [1 Stat. 468], to ordain all rivers actually navigable, as common law rivers, whether or not the tide ebbs and flows.

8. Wharves or docks must be constructed so as not to impair, but to facilitate navigation and commerce, and as such be open to the landing of all—the moorage of all vessels, without "tax, impost or duty."

9. When a highway upon the land, and another upon the water, adjoin, the right of passage from one to the other is free to all. Fowler v. Mott. 19 Barb. 204.

[1] [Reported by John S. Newberry, Esq.]

10. A lease, giving the lessee "the sole and exclusive right to use the public wharf for his ferry boat," does not authorize the collection of toll for wharfage.

In admiralty.

Walkers & Russel, for libelants.
J. M. Howard and Towle, Hunt & Newberry, for respondent.[2]

George B. Russel, libelant, was the lessee, from the city of Detroit, of the wharf at the foot of Woodward avenue, one of the principal streets of the city. When the city was originally laid out, under authority of congress, Woodward avenue was laid out and platted to the Detroit river. It has subsequently been extended by filling up, and the erection of a wharf, some 300 or 400 feet into the river, which wharf is the one in question. The Empire State, a large vessel used in navigating the lakes, while lying at the dock immediately below Woodward avenue, lapped on to the street, while engaged in unloading her cargo. Russel then brings his action for wharfage.

A. Russel, for libelants.

The right to build wharves in any manner, so as not to impede navigation, is disputed by no authority of the civil or common law. There is a distinction between the right to approach the shore where the river is in a wild state and the harbor of a crowded city. Inst. Just. lib. 2, tit. 1, 1, 4; Dig. 1, 8, 6; Bagott v. Orr, 2 Bos. & P. 472. See, also, 3 Kent, Comm. 417, note 6; Id. 413; and Blundell v. Catterall, 5 Barn. & Ald. 268. By the common law, navigable waters were those affected by the tide, and innavigable waters were tideless, although they were public rivers, and actually navigable. 3 Kent, Comm., ubi supra; Ang. Water Courses. § 596 et seq. On navigable rivers the adjoining proprietors took to the edge; on innavigable, to the centre of the stream. Howard v. Ingersoll, 13 How. [54 U. S.] 381; Berry v. Carle, 3 Greenl. 269; Spring v. Russell, 7 Greenl. 273; Simpson v. Seavey, 8 Greenl. 138; Wadsworth v. Smith, [11 Me.] 278; Claremont v. Carlton, 2 N. H. 369; Slate v. Canterbury [8 Fost. (N. H.) 198]; 3 N. H. 34; 9 N. H. 461; Lunt v. Holland, 14 Mass. 149; Id. 600; Id. 431; 20 Pick. 186; 2 Conn. 481; 9 Conn. 138; 7 Conn. 186; 8 Conn. 231; Ex parte Jennings, 6 Cow. 518, and note; Palmer v. Mulligan, 3 Caines, 308; Hooker v. Cummings, 20 Johns. 91; 17 Johns. 201; 26 Wend. 408; 5 Cow. 216; 11 Ohio, 311; Id. 138; 30 Ohio St. 496: 16 Ohio St. 540; 1 Rand. 417; 3 Rand. 33; 4 Call, 411; 3 Blackf. 193; 5 Har. & J. 195; 5 Scam. 500; 2 Swan, 9; 1

Ired. 395; Tayl. [N. C.] 196; 6 Mart. [La.] 119; Moore v. Sanborne, 2 Mich. 520; 2 Port. (Ala.) 436; 1 McCord, 580; 2 Bin. 475. But the definition of the term "navigable" has been altered to conform to the fact. Carson v. Blazer, 2 Bin. 475; 2 Swan, 9; La Plaisance Harbor Co. v. City of Monroe, Walk. [Mich.] 155; Moore v. Sanborne, 2 Mich. 520; Bowman v. Wathen [Case No. 1,740]. By the common law, the riparian proprietor upon navigable waters has the right of erecting wharves, and controlling the access to the river. Bowman v. Wathen [supra]; Blundell v. Catterall, ubi supra; Ang. Water Courses, § 55; Morgan v. Reading, 3 Smedes & M. 366; Ball v. Herbert, 3 Term R. 253; 7 Conn. 186; 2 Ohio, 307; 11 Ohio, 138; 2 Ohio, 403; 1 Yeates, 167; 9 Serg. & R. 26. The governor and judges so supposed. See their report to congress. State Papers, vol. 5, 1831. The United States passed a law laying a wharf in Detroit. 4 Stat. 55. The legislature of Michigan likewise. See Sess. Laws 1855, p. 291. The ordinance of 1787 was in the nature of a treaty, and was simply declaratory. Ang. Water Courses. § 556; Kent, Comm. 427; Strader v. Graham, 10 How. [51 U. S.] 82; Columbus Ins. Co. v. Curtenius [Case No. 3,045]; Jolly v. Terre Haute Draw Bridge Co. [Id. 7,441]; La Plaisance Harbor Co. v. City of Monroe, Walk. [Mich.] 155; 3 Ohio, 495; 5 Ohio, 410.

The next question as to the street is, has it been dedicated? Prima facie the fee to the centre of the street is in the adjacent proprietor, subject to the public easement. Livingston v. Mayor, etc., of New York, 8 Wend. 85, and cases cited; 20 Wend. 96; 7 Conn. 48; Pittsburgh Case, 6 Pet. [31 U. S.] 498; 3 Watts. 219; 9 Serg. & R. 296; Yeates, 167. Highways on land and water are not subject to the same principles of law, nor have they the same incidents. Ball v. Herbert, 3 Term R. 253. Dedication is not predicable of landing places. See 20 Wend. 131, 133, affirmed on error 22 Wend. 425; 8 B. Mon. 232. Granting, for the sake of argument, that the street has been dedicated, then the city has the power of regulating. As to the extent of this power, see Kennedy v. Jones, 11 Ala. 63; Rowan's Ex'rs v. Town of Portland, 8 B. Mon. 232; 7 Conn. 293; Dugan v. City of Baltimore, 5 Gill. & J. 357, overruling the wharf case in 3 Bland, 361. See Revised Charter Detroit, pp. 24, 30, 68.

J. S. Newberry, for respondent.

I. The entire right of soil in the bed of the Detroit river is in the government or the public, or it has been dedicated to the public, either of which precludes it from being exclusively appropriated by any private person or corporation. The ordinance of 1787 fully dedicates the Detroit river to the public. It is a great natural highway, and carries with it all the incidents and appurtenances of a highway. Spring v. Russell. 7 Greenl. 275, 290; 3 Shep. 269. The common law rule, that

---

[2] This case and the preceding case of George B. Russel v. The Asa R. Swift [Case No. 12,144], were, by consent of counsel, tried and argued together, and but one argument made. They were decided, however, upon different grounds, and a separate opinion rendered by the court.

the riparian proprietor of rivers where the tide does not ebb and flow, owns the bed of the river ad filum aquæ, has in no state been applied to rivers forming national boundaries. See 17 Wend. 597; 12 Barb. 201; 19 Barb. 490. The whole theory of navigable rivers, thus defined, arose in England, where, as a matter of fact, the ebb and flow of the tide was the criterion of navigability. The most enlightened jurists of this country have refused to apply to our vast rivers and inland seas the puny distinctions and doctrines which have been applied to their insignificant rivers. In New York, see 17 Wend. 597–599; 12 Barb. 201, 206; 19 Barb. 490. In Pennsylvania, see 2 Bin. 475, 483, 484; 14 Serg. & R. 71; Zimmerman v. Union Canal Co., 1 Watts & S. 351; Case of Philadelphia & Trenton R. Co., 6 Whart. 44; Bailey v. Philadelphia, W. & B. R. Co., 4 Har. [Del.] 389; Ball v. Slack, 2 Whart. 539; Bacon v. Arthur, 4 Watts, 439. In Alabama: Bullock v. Wilson, 2 Port. 436, 448; Mayor of Mobile v. Eslava, 9 Port. 577. In South Carolina: Executors of Cates v. Wadlington, 1 McCord, 580. In Virginia: Home v. Richards, 4 Call, 441. In Tennessee: 3 Yerg. 387; 2 Swan, 9. In North Carolina: Ingram v. Threadgill, 3 Dev. (1831) 59; Collins v. Benbury, 3 Ired. 277. In Michigan: La Plaisance Harbor Co. v. City of Monroe, Walk. 155; Bowman v. Wathen [Case No. 1,740]; Pollard v. Hagan, 3 How. [44 U. S.] 212, 229.

II. Granting that the adjacent owners have the fee of the bed of the river, then the public have the right to the free and unobstructed navigation of the river, in its entire breadth, as a highway. Hart v. Mayor of Albany, 9 Wend. 584, citing 6 East, 427, and 3 Camp. 226, 229; s. c. 3 Paige, 213, 217; Bacon v. City of Boston, 3 Cush. 174; 1 Cush. 443; 7 Wend. 291; 1 Johns. 509; 16 Pick. 175; 13 Mass. 115, 118. Therefore, docks built out to seventeen feet water are an encroachment.

III. All our great rivers are subject to the easement of navigation, which includes the right to moor and land at the bank, when necessary. Hanson v. City Council of Lafayette, 18 La. 295, 305; Trustees of Natchitoches v. Coe, 3 Mart. (N. S.) 140; O'Fallon v. Daggett, 4 Mo. 343, 345; 3 Smedes & M. 366, 408; 1 Camp. 517, note; 3 Scam. 521; 13 Wend. 371; Brown v. Chadbourne, 31 Me. 9, 24; Stuart v. Clark's Lessee, 2 Swan, 5, 3 Yerg. 307.

IV. Wharves may be built between high and low water, but no case can be found where they are allowed to go further, and a fee charged for the use of such erection, without express grant. Inhabitants of East Haven v. Hemingway, 7 Conn. 186; 9 Conn. 38; 5 Pick. 492–494; 3 N. H. 324; Arnold v. Mundy, 1 Halst. [6 N. J. Law] 1, and see pages 67, 76; 2 Zab. [22 N. J. Law] 441; Gunter v. Geary, 1 Cal. 463, 469; The Wharf Case, 3 Bland, 373, 374. See, also, pages 380, 382; 20 Pick. 186; 11 Ohio, 138.

V. A ferry or a wharf, &c., &c., with a right to take tolls, cannot be established by a private individual, but only by the sovereign power. 1 Yates, 167; 9 Serg. & R. 26; 3 Watts, 219; 8 Watts, 454,—cited by libelants, were, every one, cases where the ferry was established by an act of the assembly. 31 Me. 21; 2 Conn. 481; 8 Watts, 434; 10 Yerg. 280; 5 Yerg. 108; 1 Nott & McC. 387; 13 Ill. 27; 3 Mo. 470; 3 Scam. 53; 8 Greenl. 365. The last four cases seem to hold that a person cannot land a ferry on his own land without consent of the state or grant. 3 Bland, 380, 382; 3 Paige, 313; 9 Ohio, 165, 167.

VI. A ferryman has a right to land at a public highway. 2 Rob. (Va.) 209, 214; 1 Blackf. 43; 3 Bland, 375; 6 Shep. 433 (18 Me.); 19 Barb. 204, 220. Holding, also, that it is a public common right to pass from a highway on land to a highway on water, when they adjoin.

VII. The common council of Detroit has no power to grant the exclusive use of the highways, streets, &c., of said city, to any individual. People v. Carpenter, 1 Mich. 273.

In the case of Russel v. The A. R. Swift [Case No. 12,144] the two following additional points are taken:

I. By the general maritime law there is no lien created for supplies, materials, &c., or indeed for anything upon a domestic vessel. There is but one case where the admiralty courts have jurisdiction over domestic vessels; and that is by rule 12 of the supreme court, which provided that when the local law gives the material man a lien he may proceed in admiralty against domestic vessels. Conk. Adm. pp. 56, 61; Peyroux v. Howard, 7 Pet. [32 U. S.] 324; [The General Smith] 4 Wheat. [17 U. S.] 438; The Robert Fulton, [Case No. 11,890]; Davis v. New Brig. [Id. 3,643].

II. The lien of the wharfinger is a common law lien, depending upon possession, and not enforceable if the possession has been parted with. Gardner v. The New Jersey [Id. 5,233]; Johnson v. M'Donough [Id. 7,395]; The Betsy [Id. 1,364].

The brief of the Hon. J. M. Howard was not furnished the reporter.

WILKINS, District Judge. Libel for wharfage, setting forth that the libelant is the lessee, from the city of Detroit, of a wharf situated at the foot of Woodward avenue, and extending beyond the terminus of the said avenue, into the river Detroit. The answer denies the authority of the city to execute such lease, and avers "that Woodward avenue as originally laid out by the governor and judges of the territory of Michigan, was dedicated to the public as a street and highway extending to the water's edge of the river Detroit, and was from the time of such dedication ever used as a public highway, and that the extension of the said

street towards the centre of the river, has also ever been used." This denial and averment presents the main issue, to which the court will solely direct its attention, considering the other points presented as of minor importance.

The answers of the libelant to the 3d, 5th and 6th interrogatories propounded by the respondents, admits that the wharf is held by him as an exclusive possession, under a conveyance from the city corporation; that that portion of the said Woodward avenue which lies between the original margin of the river, and the wharf leased, has been used as a public street for the space of more than twenty years, and that, during that time the terminus of the said avenue, as used by the public, extended to the water's edge of the river; and that the said wharf is "practically an extension of the said avenue." Satisfactory proof has been exhibited to the same effect; and that, for more than twenty-four years, Woodward avenue was always open to the river, and to the uninterrupted egress and regress of the inhabitants of both sides, and the unmolested arrival and departure of vessels. In September, 1832, large steamers landed there their passengers and discharged there their freight. The lease from the city was executed on the 1st of May, 1856. For the consideration of $350 it conveys to the libelant and his assigns for the term of one year "the sole and exclusive right to enter upon and use the said wharf at the foot of Woodward avenue," for the purpose of mooring his vessels and receiving and landing passengers and freight therefrom, as a ferry between Detroit and the neighboring province of Canada West, "and entitling him to use the same against all boats and vessels other than his own, engaged in any other employment whatsoever, and which may in any way obstruct or interfere in his use of the said wharf as a ferry landing."

Two questions of considerable interest are embraced in the issue: (1) The authority of the city corporation to make the lease on which the libelant relies, and (2) the extent of the privilege conferred.

I. Whatever authority the city of Detroit as a corporation, possessed over the premises in question, to dispose of or lease the same, must be derived from the statutes of the United States. As a municipal government, it would have only power to regulate, and could only occupy or vacate a public street or highway, dedicated as such, antecedent to its existence as a corporation. Neither can the city be deemed as possessing a riparian right unless as proprietor of the fee. The "town of Detroit" was laid out and platted into lots by numbers, and into streets and public squares by name, under the provisions of the act of congress of April 21, 1806 [2 Stat. 398]. The governor and judges of the then territory of Michigan, were authorized to lay out a town "including the whole of the old town of De-

troit," and ten thousand acres adjacent, and "finally adjust all claims to lots therein." Shortly after the authority conferred by this act, on the 27th of April, 1807, the governer and judges, as the agents of the government of the United States, discharged the trust committed to them; and those portions of the soil dedicated as public streets, became such for common use, and beyond the power of resumption by the original proprietor, with whom alone the fee continued. The dedicatory act of the agent was the act of the principal; the deed of the proprietor for the purposes expressed. And thus Woodward avenue was dedicated as a public highway to the water's edge of the river Detroit. By the act of 1842 [5 Stat. 541], "the lands" thus divided into lots, as by the original plat, remaining unappropriated under the act of 1806, were vested in the mayor, recorder and aldermen of the city of Detroit "to be disposed of by them at their discretion;" and the city was authorized to make deeds to purchasers, or "other sufficient conveyances."

The sole object of this act was to confer upon the city authorities, the power which had been exercised by the old territorial land board, and vest in the city the title to the lots remaining unsold, for purposes of improvement. By the act of 1806, the power of the governor and judges was limited to the grant of lots as numbered in the plat of the town which they were directed to "lay out," and no greater power is given to the city by the act of 1842. "To make deeds or other sufficient conveyances" of "the land remaining after satisfying all just claims, and the payment of expenses incurred," are terms in the last statute, not augmenting the power of the city beyond that of the governor and judges, but expressly limiting the donation to the fee of the lots remaining unappropriated. The city obtained no title whatever to the soil of the streets, the fee of which continues in the original dedicator, unless the purchasers of the lots bounded thereby, may be considered as having the fee of the same under their respective grants.

There is no ambiguity in the terms of the grant. One specific object is had in view. To grant the lands remaining unsold under the prior act to the city, to be applied to objects of public improvement: evidently meaning that the proceeds arising from the sale of the unsold lots should be so applied. The public streets remain as originally dedicated and no right of possession is given, and there is no transfer of the fee in them; and, consequently the city cannot occupy them, except for purposes of regulation, either by public buildings, for public use, or give authority to others to do so. The character of the use cannot vary the terms of the grant, or convey that which was expressly withheld. The public squares and streets thus dedicated, are beyond all subsequent change to another purpose, and the corporation is as much inhibited as the private citizen. Neither the governor and judges,

as the old land board had, nor their successors, the city authorities as the new land board, have now any power beyond that of regulation of the streets and public squares. In this is exercised the functions of municipal government, but the power to govern is not, nor does it include the right to sell, lease or exercise over the same any act of ownership.

In the language of the supreme court of the state in the case of People v. Carpenter [1 Mich. 273], "the common council of the city of Detroit have no power to grant the exclusive use of any of the streets to individuals." The exercise of such authority is injurious to public and private rights, and contrary to the act of dedication. Such rights are vested rights—the right of free passage over and through the dedicated public street; and it is not competent, even for the legislature of the state, much less for the common council of the city, to pass any act or ordinance, which would in any wise impair, restrict or defeat the right of way under the act of dedication.

By the recorded plan of the city, confirmed and made of record in 1807, Woodward avenue and most of the parallel streets running at right angles with Jefferson avenue, terminated south at the water's edge of the river Detroit; or, in other words, they run to the river. Such was the declared intention of the dedicator. To that extent they are common to all as highways. Any building, therefore, whether public or private, whether a court house, jail, city hall, market or wharf, erected upon them, either by the corporation or others under their authority, and defeating the main objects of dedication, would amount to an obstruction, and as a public nuisance would be liable to be abated. Unquestionably, the city may improve, ornament and grade for public convenience, either by enlargement or extension, the public streets; and with a view to public accommodation, erect at their termini, in the river, suitable wharves or landings, but, by so doing, such erections become free to the public, as extensions of the streets, and the city has no authority, and can confer none, to exact toll for egress or regress. But these streets are not only the dedicated highways of the city of Detroit, in which the city has no other power than that of regulation, but as highways they have their declared termini in connection with another public highway, national in its character, common to all the inhabitants of the United States, and, by treaty, free to the subjects of a foreign power.

The 4th article of the ordinance of 1787, in declaring the navigable waters leading into the Mississippi and the St. Lawrence, common highways and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and all the states, "without any tax, impost or duty," comprehends the river Detroit, and negates the right of the United States, or of any state, or any

subordinate power, by law or ordinance, to exact any fee, charges or impost in its navigation. It is free to all for the purposes of commerce and trade. And the 9th section of the act of the 18th of May, 1796 [1 Stat. 468], is not only declaratory of the same; but in making a distinction between the streams not, and those navigable, where the opposite banks belong to different persons, and enacting that their beds shall belong and be common to both, clearly manifests the intention of the law making power to ordain all rivers actually navigable as common law rivers above the flow of the tide. But the court does not consider this issue to involve the right of a riparian proprietor. The city corporation is not such, and the river being a national public highway, the city authorities cannot appropriate any portion of it to its use so as to obstruct its free navigation. Its wharves or docks must be so constructed as not to impair, but facilitate navigation and commerce; and, as such, be open to the landing of all and the moorage of all vessels, "without tax, impost or duty." The act of dedication of the streets, the declaratory ordinance of 1787, are all in accordance with this treaty of 1794, are all in accordance with this position. The streets are free; the river is free. Both may be improved at the expense of the city, for the public benefit, as streets are graded and paved, but not to the detriment of private right thus solemnly and repeatedly established. Any other construction would seem to frustrate the intention of the dedication; for, should the city possess the power to wharf and lease the termini of all the streets communicating with the river, all access to the city from the latter would be subject to "tax, impost and duty," in contravention of the ordinance, and the right of way prescribed by the dedication of 1807.

The leading case cited in the argument, from 19 Barb. 204, of Fowler v. Mott, fully supports this view. The court there declares that "our public highways are equally free to all to the water's edge, if they extend so far. It is a common right to pass from one highway to another, when they adjoin each other. Such is the law of highways upon the land; and there can be no difference in principle, where one highway is upon the land and the other upon the water. Both are free for the passage of all."

Independent of these considerations, which are conclusive, the privilege granted to the libelant by the lease, would not warrant the collection of wharfage. But the lease, in giving him "the sole and exclusive right to use the public wharf for his ferry boats," does not authorize him to charge wharfage as to other vessels mooring there. Conceding the validity of his lease, any obstruction of his privilege, would make the trespasser amenable to another tribunal, and in another form of action. Libel dismissed, with costs.